Brett L. Tolman (8821)
Eric G. Benson (10414)
**RAY, QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah 84145-0385
Telephone: (801)532-1500
E-mail:        btolman@rqn.com
               ebenson@rqn.com

Charles S. Siegel (admitted *pro hac vice*)
Loren Jacobson (admitted *pro hac vice*)
Caitlyn Silhan (admitted *pro hac vice*)
**WATERS & KRAUS, L L P**
3219 McKinney Ave.
Dallas, Texas 75204
Telephone: (214)357-6244
E-mail:        csigel@waterskraus.com
               csilhan@waterskraus.com
               ljacobson@waterskraus.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
### (Central Division)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **CRAIG BEARDEN, Relator,** | § § § § § | **Filed in Camera and Under Seal** |
| | § | **Pursuant to 31 U.S.C. § 3730(B)(2)** |
| **v.** | § § | **Civil Action No. 2:13-cv-01127** |
| **ARIZONA MEDICAL SUPPLY, LLC, d/b/a WESTERN MEDICAL and SENIOR FIRST MEDICAL; KMR MEDICAL, LLC; KPM CAPITAL, LLC; PRIVACY MAXX, LLC; and  JODY ROOKSTOOL,** | § § § § § § § § | **DO NOT PLACE ON PACER DO NOT SERVE DEFENDANTS DO NOT PLACE IN PRESS BOX** |
| **Defendants.** | § § | |

## RELATOR'S FIRST AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, AND DEMAND FOR JURY TRIAL

### I.   INTRODUCTION

1.   This is an action to recover damages and civil penalties on behalf of the United States

of America arising from false and/or fraudulent, continuous claims made, used, and caused to be made, used, or presented, by Arizona Medical Supply, LLC, d/b/a Western Medical and Senior First Medical, KMR Medical, LLC, KPM Capital, LLC, Privacy Maxx, LLC, and Jody Rookstool, and/or their agents, employees, and co-conspirators (herein collectively referred to as "Defendant"), in violation of the federal False Claims Act ("FCA").

2.   From at least July 2013 through the present, Arizona Medical has knowingly billed Medicare for knee and back braces that were ordered as a result of prohibited telemarketing that, upon information and belief, was by agreement with Privacy Maxx. Medicare is specifically prohibited from making payment to a supplier that knowingly submits a claim generated pursuant to prohibited telephone solicitation. Accordingly, any and all such claims for payment are false within the meaning of the FCA. Upon information and belief, Defendants have been engaging in similar fraudulent practices since at least 2012.

3.   Furthermore, Arizona Medical Supply, d/b/a Western Medical, routinely waives Medicare copayments, and therefore misstates its actual charge to Medicare, in violation of Medicare rules and the Anti-Kickback Statute. In Mr. Bearden's experience, Western Medical has never collected a copay from a single Medicare patient; on information and belief, it waives copays for each and every Medicare beneficiary, telling them the braces are fully-covered by Medicare and that there is no out-of-pocket expense for the beneficiaries.

4.   Defendant Arizona Medical Supply, d/b/a Senior First Medical, calls Medicare beneficiaries who have previously been targeted by Western Medical and Privacy Maxx's telemarketing calls to sell them pain and scar creams. Because Medicare is prohibited from

paying for "any item subsequently furnished to the individual by the supplier" after unsolicited telemarketing, Senior First Medical's claims for payment for the scar and pain creams are false within the meaning of the FCA.

## II. JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

6.  This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendants can be found in, reside or transact, or have transacted business nationally and specifically within the District of Utah.

7.  Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§1391(b) and (c) because Defendants have transacted business in the District of Utah.

## III. PARTIES

8.  The Relator, Craig Bearden, is a resident of Utah. Mr. Bearden began working for Defendant Western Medical as a sales representative in its American Fork, Utah call center on November 6, 2013. He was terminated on December 20, 2013, by David Nolan, the VP of Sales, because his "conversion" was not satisfactory and because he did not have enough "fire" – *i.e.*, he was not pushy enough - on his sales calls.

9.  Relator bases his allegations on his direct observations, independent, personal knowledge of Defendants' conduct, and documents in his possession. Mr. Bearden is the original source of the information underlying this Complaint and has provided substantially all material evidence and information in his possession to date, as required by the False Claims

U.S. ex rel. Bearden v. Arizona Medical Supply et. al
SEALED First Amended False Claims Act Complaint

Page 3 of 23

Act, 31 U.S.C. § 3730(b)(2), prior to filing the instant Complaint.

10. Defendant Arizona Medical Supply, LLC, is an Arizona corporation doing business as Western Medical and Senior First Medical. Arizona Medical Supply is a durable medical equipment and prosthetics and orthotics supplier operating under the NPI number 1881656114 when doing business as Western Medical, and under NPI number 1326479494 when doing business as Senior First Medical. Its primary place of business is 831 E. 340 S Suite 130, American Fork, UT 84003. Its principal, corporate agent, and alter ego is KMR Medical, LLC, and its CEO is Jody Rookstool.

11. Defendant KMR Medical, LLC is a Utah company that filed Articles of Dissolution on October 18, 2013, listing its date of dissolution as August 1, 2013. Pursuant to Utah Code Ann. § 48-2c-1203, KMR Medical, LLC continues to exist and may be sued in its own name. Its primary place of business is 831 E. 340 S Suite 130, American Fork, UT 84003. It is a durable medical equipment supplier operating under the NPI number 1477825504. Its manager, corporate agent, and alter ego is KPM Capital, LLC, another entity incorporated in Utah.[1]

12. KPM Capital, LLC is a Utah company with a primary place of business at 831 E. 340 S Suite 130, American Fork, UT 84003.  The company is managed by Jody Rookstool and Ben George. As set out above, KPM Capital, LLC is the principal, corporate agent, and alter ego of KMR Medical, LLC.

13. Defendant Jody Rookstool is the CEO of both Arizona Medical Supply and KMR

---

[1] KMR Medical may also have an NPI number under the name "KMR Medical Supply." KMR Medical Supply's address is also 831 E. 340 S Suite 130, American Fork, UT 84003. The National Plan and Provider Enumeration System lists it as a durable medical equipment supplier under the NPI number 1710233747, and lists its CEO as Jody Rookstool.

Medical Supply. He is a manager of KPM Capital. He owns, operates, controls, sets policies for, and controls the business affairs of the entities listed in the foregoing paragraphs. He is a resident of Utah, and may be served with process at his principal place of business, 831 E. 340 S Suite 130, American Fork, UT 84003.

14. Defendant Privacy Maxx, LLC is an Arizona company that, upon information and belief, conspires with Arizona Medical Supply, KMR Medical, and/or KPM Capital to conduct unauthorized solicitation of Medicare beneficiaries. Its principal place of business is 15849 N. 71st St., Suite 100, Scottsdale, AZ 85254.

## IV. LEGAL BACKGROUND

### A. Federal False Claims Act

15. The FCA prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the federal government. 31 U.S.C. § 3729(a)(1)(A).

16. A person acts "knowingly" under the FCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). No proof of specific intent to defraud is required by the FCA. *Id.* at § 3729(b)(1)(B).

17. FCA violations may result in civil penalties of between $5,500 and $11,000 per false claim, plus three times the amount of damages sustained by the Government as a result of the Defendants' illegal conduct. 31 U.S.C. § 3729(a).

### B. Medicare

18. Medicare is a federally-funded health insurance program benefiting the elderly,

disabled, and those afflicted with end-stage renal disease. 42 U.S.C. § 1395 *et seq.*

19. Medicare is administered by the Center for Medicare and Medicaid Services ("CMS"), a division of the Department of Health and Human Services ("HHS").

20. Medicare may not pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y (a)(1)(A).

### C. Medicare Payment for Durable Medical Equipment and Prosthetic and Orthotic Devices

21. Durable medical equipment ("DME") means equipment, furnished by a supplier or home health agency, that can withstand repeated use; is primarily and customarily used to serve a medical purpose; is generally not useful to an individual absent an illness or injury; and is appropriate for use in the home. 42 C.F.R. § 414.202. Prosthetic and orthotic devices ("P&O") include leg, arm, back, and neck braces. Collectively, DME and P&O suppliers are referred to using the initialism "DMEPOS."

22. Medicare covers back and knee braces "when furnished incident to physicians' services or on a physician's order." Medicare Claim Processing Manual, §10.1.3.

23. DMEPOS Suppliers, including Defendants, enroll with Medicare using Form CMS-855S, which includes the following certification statement, signed under penalty of perjury:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare. . . I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

24. A supplier is required to certify in its application for billing privileges (Form CMS-885S) that it "[a]dvises beneficiaries that they may either rent or purchase inexpensive or routinely purchased durable medical equipment[.]" 42 C.F.R. 424.57(c)(5); Form CMS-885S.

25. Suppliers are also required to "agree not to contact a beneficiary by telephone when supplying a Medicare-covered item" unless the beneficiary has given the supplier written permission to do so; the supplier has furnished a covered item to the individual and is contacting the individual to coordinate delivery; or the supplier has previously supplied another kind of covered item to the beneficiary in the past 15 months. 42 U.S.C. § 1395m(a)(17); 42 C.F.R. 424.57(c)(11); *see also* HHS OIG, Publication of OIG Updated Special Fraud Alert on Telemarketing by Durable Medical Equipment Suppliers, 75 Fed. Reg. 2105 (Jan. 14, 2010); Form CMS-855S.

26. DMEPOS claims are billed to Medicare through Durable Medical Equipment Regional Carriers ("DMERC") using either Form CMS-1500 or electronic equivalents. *Id.* at §110.1. These claim forms require the supplier to certify that the information contained on the form "is true, accurate and complete" and to certify that the supplier understands "that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." CMS-1500.

27. "Medicare pays for durable medical equipment, prosthetics and orthotics . . . on the basis of 80 percent of the lesser of-- (1) The actual charge for the item; (2) The fee schedule amount for the item[.]" 42 CFR 414.210(a). Beneficiaries are responsible for a 20% copay or coinsurance. For P&O devices, "[p]ayment is made on a lump-sum basis." 42 C.F.R. §

414.228.

28. Medicare is prohibited for paying "for any item subsequently furnished" after unsolicited contacts," 42 U.S.C. § 1395m(a)(17)(B), and "suppliers engaging in a pattern of unsolicited contacts" "shall" be excluded from participation in Medicare. *Id.* at 42 U.S.C. § 1395m(a)(17)(C).

29. 42 U.S.C. § 1395m(a)(17)'s prohibition on unsolicited telemarketing by a DME supplier to Medicare beneficiaries renders a claim for payment fraudulent "whether the contact with a beneficiary is made by the supplier directly or by another party on the DME supplier's behalf." 75 Fed. Reg. 2105. "[S]uppliers cannot do indirectly what they are prohibited from doing directly." *Id.*

30. "Moreover, a DME supplier is responsible for verifying that marketing activities performed by third parties with which the supplier contracts or otherwise does business do not involve prohibited activity and that information purchased from such third parties was neither obtained, nor derived, from prohibited activities." *Id.*

31. Claims for payment submitted for items or services generated by a prohibited solicitation are false and fraudulent under the False Claims Act.

**D. The Anti-Kickback Statute**

32. The Anti-Kickback Statute (AKS) makes it illegal to offer, pay, solicit, or receive anything of value as an inducement to generate business payable by Medicare. 42 U.S.C. 1320a-7b(b).

33. In addition to criminal penalties, a violation of the AKS can also subject the perpetrator to exclusion from participation in federal health care programs, 42 U.S.C. § 1320a-7(b)(7), as

well as civil monetary penalties of $50,000 per violation, 42 U.S.C. § 1320a-7a(a)(7), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

34. Compliance with the AKS is a precondition to participation as a DMEPOS supplier under the federally-funded healthcare programs and the state Medicaid programs. In addition, compliance with the AKS is a condition of payment for claims for which Medicare or Medicaid reimbursement is sought by DMEPOS suppliers. Form CMS-855S, *supra* at ¶ 23.

35. In March 2010, the AKS was amended to explicitly state that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act ("PPACA"), Pub.L. No. 111-148, 124 Stat. 119 § 6402(f) (2010) (codified as amended at 42 U.S.C. § 1320a-7b(g)).

36. A supplier who routinely waives Medicare copayments or deductibles is misstating its actual charge and unlawfully inducing the patients to purchase or request items or services from them in violation of the AKS. HHS OIG, Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65,372 (Dec. 19, 1994).

## V.  FACTUAL BACKGROUND
### A. Defendants' Fraudulent DMEPOS Scheme

37. Since at least July 2013, Defendant Arizona Medical Supply, d/b/a Western Medical, has been billing Medicare for DME and P&O items that were generated by prohibited solicitation by a telemarketing service based out of the Philippines that, upon information and belief, is jointly-retained by Arizona Medical Supply, its principals, corporate agents, and alter

egos, as well as Privacy Maxx.

38. First, the Philippine-based call center places unsolicited calls to individuals in the United States, offering to sell them Privacy Maxx identity theft protection. For individuals aged 60 or older, the call center automatically transfers them to the Western Medical call center in American Fork, Utah, where a sales rep like Mr. Bearden takes the call, purportedly to verify the caller's information. In fact, however, sales reps are directed to sell knee and back braces to the callers, regardless of whether the beneficiaries have a legitimate medical need for them.

39. According to David Nolan, the VP of Sales who trained Mr. Bearden in November 2013, sales reps need to find a way to justify a need for a back or knee brace. Accordingly, while the sales rep has the caller on the line, he or she asks whether the caller has had any knee or back injuries or pain – even if a decade earlier. Reps are trained that all people have some sort of knee or back pain at some point in their life, and the reps must "drive the calls until the wheels fall off" in order to find a justification for ordering a knee or back brace.

40. A copy of Western Medical's "script" is attached hereto as <u>Exhibit A.</u> The script refers to a "packet" of information; in Mr. Bearden's experience, not a single beneficiary he has spoken to has received the packet. A copy of a document in the "packet" is attached as <u>Exhibit B.</u>

41. A new "script" was distributed to Mr. Bearden on December 18, 2013, by his current team leader, Mike Merchant. <u>Exhibit C</u>. This script makes no reference to any kind of packet, but states

<u>U.S. ex rel. Bearden v. Arizona Medical Supply et. al</u>                    **Page 10 of 23**
**SEALED First Amended False Claims Act Complaint**

[I]t looks like you were transferred to me by one of my identity theft representatives and I'm here to talk to you about the second portion of information and verify a few things for us. I'm in a different division here in our company, at Western Medical we are a Medicare certified DME provider. We work along side Medicare to help seniors with their entitled benefits. I see here _____, that you have been using Medicare for a little while now right? Ok perfect... well I see here that you were eligible to receive a back support and two knee supports paid for by medicare, were you aware of that _____. You weren't? Oh, perfect...well I'm happy to bring the good news for you today. This is a fully covered benefit that you have earned through medicare so there is no out of pocket expense for you at all. I just simply verify a few things and send a note to your doctor letting them know that you are eligible to receive the supports at no cost, paid for by medicare. Your doctor handles everything from that point forward. Ok, now concerning your knees and back, do you experience stiffness and soreness everyday or just every now and again? Ok wonderful.....that's exactly why I am talking with you today...

42. Mr. Nolan instructs sales reps that while seniors may initially say that they do not have a need for a back or knee brace, they should "dig, dig, dig" until the beneficiaries agree to authorize Western Medical to contact their physician and, if he or she signs off, to order knee and back braces for them.

43. Mr. Bearden was also instructed by his initial team leader, Jenna Bailey, that reps were expected to sell all three supports – a back brace and two knee braces – to callers, not just one. Mr. Bearden was told to explain to them that "I know that you don't need the [knee or back] support but that this is a covered benefit through  Medicare and all we are doing here is sending over a letter to the doctor and letting them know that the benefit is available. If the doctor feels that you don't need it they will just put it in your file for future reference."

44. In cases where the Medicare beneficiary declines to request a knee or back brace from Western Medical, the rep is instructed to say "You're denying your Medicare benefits? Let me

mark that down for you," in an effort to pressure the caller into accepting the offer.

45. After the beneficiary indicates that he or she would like Western Medical to contact his or her doctor and then order the braces, the rep collects his/her insurance and physician information.

46. Then the rep is instructed to read the "Medicare statement" attached as <u>Exhibit D.</u> During his training, Mr. Bearden learned from other sales reps to preface this statement by explaining to the beneficiary that "this is only so that Western Medical can send the information to your doctor, it doesn't mean you have a need [for the brace]." That is, in case the patient admittedly does not require a knee or back brace, he or she is reassured that the doctor will make the ultimate determination and can always just keep the information in the patient file until there is a "need."

47. After the statement is read, beneficiaries are instructed to state their name and date, and to state that they agree with and understand the statement.

48. The reps then prepare the beneficiaries for the next step, "quality assurance," and tell the beneficiary that the QA representative will confirm that he or she is requesting two knee braces and a back brace; the sales rep instructs the beneficiary to answer with a simple "yes" so that his or her information can be sent to the doctor even if the beneficiary does not yet need the braces.

49. QA representatives verify all of the beneficiary's personal information and then terminate the call. Within minutes, another team checks to make sure that Medicare coverage is valid and that they have the correct information for the doctor's office. If so, they send out a

prescription request right away; if not, a "case" is opened and the sales rep calls the beneficiary back to get the correct information.

50. Sales reps also instruct beneficiaries to call their doctors as soon as they end the call with Western Medical to let them know that they will be receiving information from the company. Mr. Bearden was told by Ms. Bailey that this is done to improve the chances of getting a signed prescription back from the doctor.

51. Once the company receives a completed order or prescription form from the doctor, the company ships the product and bills Medicare.

52. Because sales reps are also instructed to ask callers if there are other Medicare beneficiaries in their household, the average number of braces per "sale" is 3.1. In one call, for example, Mr. Bearden sold 6 braces, all covered by Medicare. The "record" is 15 braces on a single call.

53. In Mr. Bearden's experience, and on information and belief, about 60% of all orders or prescriptions sent to physicians are approved, and approximately 80% of Western Medical's sales are billed to Medicare.

54. As set out above at paragraph 27, Medicare pays 80% of the actual charge or fee schedule amount of an item, while the beneficiary is responsible for a 20% copay, unless the supplier waives this amount after considering a particular patient's financial hardship.

55. In Mr. Bearden's experience, however, Defendants never collected a copay from a Medicare beneficiary. Indeed, as described above at paragraph 41, Western Medical representatives are trained to tell callers that "there is absolutely no out of pocket expense for

you." <u>Exhibit A</u>. Upon information and belief,  Defendants waive every single Medicare beneficiary's copay, and, as a result, misstate their actual charge to Medicare.

**B.  Defendants' False Claims to Medicare for Knee and Back Braces**

56. Arizona Medical Supply, d/b/a Western Medical, bills Medicare for two kinds of back braces: a "Lumbar-Sacral Orthotic" under code HCPCS 70631, and another "Lumbar-Sacral Orthotic" with "lateral strength" under code HCPCS 70637. Under Medicare's 2013 DMEPOS Fee Schedule, Western Medical is reimbursed 80% of between $856.46 and $1,141.94 for the former, and between $978.99 and $1,305.32 for the latter.

57. Arizona Medical Supply, d/b/a Western Medical,bills Medicare for two kinds of knee braces: an "OTS (Off the Shelf) Sleeve/Wrap" under HCPCS code L1832, and an "OTS (Off the Shelf) knee brace" under HCPCS code L1843. According to Medicare's 2013 DMEPOS Fee Schedule, Western Medical,is reimbursed 80% of between $530.77 and $707.69 for the former, and between 80% of $748.39 and $997.85 for the latter.

58. Western Medical's entire business model is built around unsolicited telemarketing; indeed, upon information and belief, none of its Medicare business is the result of affirmative initial contact by either a physician or a beneficiary.

59. Western Medical currently has a sales staff of approximately 45, each of whom are required by CEO Jody Rookstool to sell 3 braces per hour, or 24 braces per day. On December 17, 2013, for example, 13 reps exceeded their quota, while the remainder sold between 15 and 21 braces. The average number of braces sold per day, upon information and belief, is approximately 800. Mr. Bearden estimates that about 60% of these are approved by physicians,

and that approximately 80% of these are for Medicare patients. Accordingly, Western Medical bills approximately 384 braces per day to Medicare.

60. For example, Western Medical spoke to Medicare beneficiary L.H. in an unsolicited telephone call transferred from Privacy Maxx's "identity theft representatives" in the Philippines. As a result of this prohibited solicitation, Western Medical submitted claims for left and right knee braces and a back brace for L.H. in late November or early December 2013. Western Medical told L.H. that the braces would be provided "at no cost" to him/her, and did not collect a copay from this Medicare beneficiary but, upon information and belief, charged Medicare as if it did. Upon information and belief, L.H. agreed to order the braces because they were offered at no cost.

61. Likewise, Western Medical spoke to Medicare beneficiary S.R. in an unsolicited telephone call transferred from Privacy Maxx's "identity theft representatives" in the Philippines. As a result of this prohibited solicitation, Western Medical submitted claims to Medicare for left and right knee braces and a back brace for Medicare beneficiary S.R. in late November or early December 2013. By December 18, 2013, the company received payment from Medicare for the knee braces. Western Medical told S.R. that the braces would be provided at "no cost" to him/her, and did not collect a copay from this Medicare beneficiary but, upon information and belief, charged Medicare as if it did. Upon information and belief, S.R. agreed to order the braces because they were offered at no cost.

62. Western Medical spoke to Medicare beneficiary O.P. in an unsolicited telephone call transferred from Privacy Maxx's "identity theft representatives" in the Philippines. As a result

of this prohibited solicitation, Western Medical also submitted claims for left and right knee braces and a back brace for Medicare beneficiary O. P. in late November or early December 2013. Western Medical told O.P that these braces would be provided at "no cost" to him/her, and did not collect a copay from this Medicare beneficiary but, upon information and belief, charged Medicare as if it did. Upon information and belief, O.P. agreed to order the braces because they were offered at no cost.

63. Western Medical spoke to Medicare beneficiary R.G. in an unsolicited telephone call transferred from Privacy Maxx's "identity theft representatives" in the Philippines. As a result of this prohibited solicitation, Western Medical submitted claims, and received payment, for left and right knee braces and a back brace for Medicare beneficiary R.G. in late November or early December 2013. Western Medical told R.G. that these braces would be provided at "no cost" to him/her, and did not collect a copay from this Medicare beneficiary but, upon information and belief, charged Medicare as if it did. Upon information and belief, R.G. agreed to order the braces because they were offered at no cost.

64. In so doing, Arizona Medical Supply, d/b/a Western Medical, at the direction of Jody Rookstool, knowingly violated and continues to violate the FCA, as these orders are procured through prohibited solicitation, and because Defendants waived copayment amounts. The resulting claims for payment are therefore not payable under Medicare.

65. In partnering with Arizona Medical Supply to engage in unsolicited telemarketing of Medicare beneficiaries, Defendant Privacy Maxx conspired, upon information and belief, with Arizona Medical Supply to commit violations of the FCA.

U.S. ex rel. Bearden v. Arizona Medical Supply et. al
SEALED First Amended False Claims Act Complaint

Page 16 of 23

## C. Defendants' False Claims to Medicare for Pain and Scar Creams

66. Arizona Medical Supply, LLC, d/b/a Senior First Medical, also bills Medicare for PracaSil-Plus, compounded scar cream, as well as a pain cream.

67. Senior First Medical and Western Medical share a call center space in American Fork, Utah.

68. Since November 2013, Senior First Medical sales representatives have made unsolicited phone calls to beneficiaries contacted by Privacy Maxx and Western Medical's telemarketing call center in the Philippines within the preceding two months.

69. Once the beneficiary is on the phone, the process is similar to Western Medical's sales process described above: Senior First sales reps ask the beneficiary if he or she has any pain or scarring, and advises them that Medicare covers creams that their doctor can prescribe to them. Senior First then confirms the insurance and physician information in their file, obtains any additional prescription information and sends a prescription order form to their physician.

70. Sales representatives are, upon information and belief, encouraged to sell both a pain and a scar cream to beneficiaries; when they do so, the sale is called "a double."

71. The prescription order form lists the patient's information, and the prescription compound formulation for either the pain or scar cream. For the former, the cream is described as one for "musculoskeletal pain/inflammation/neuropathy." The physician is to check boxes for the quantity of the prescription and the number of refills.

72. The creams are compounded, upon information and belief, at a compounding pharmacy, and then sent by the pharmacy to the beneficiary.

73. Because Senior First contacts beneficiaries who were the subject of unsolicited telemarketing by Western Medical and Privacy Maxx, Medicare is prohibited from covering the creams. 42 U.S.C. §1395m(a)(17)(B).

74. Furthermore, because Senior First does not, upon information and belief, collect copayments from Medicare beneficiaries, it is in violation of the AKS.

## COUNT I
### DEFENDANTS' FALSE CLAIMS FOR PROSTHETICS AND ORTHOTICS INELIGIBLE FOR THE MEDICARE BENEFIT IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)

75. Relator restates and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

76. At all times relevant to this complaint, and continuing through the present day, Arizona Medical Supply, LLC, d/b/a Western Medical, knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for prosthetics and orthotics that were obtained through prohibited unsolicited telephone calls, and were therefore explicitly excluded from payment.

77. At all times relevant to this complaint, Arizona Medical Supply, LLC, d/b/a Western Medical, upon information and belief, failed to verify that marketing activities performed by its associated third parties did not involve prohibited activity.

78. At all times relevant to this complaint, Jody Rookstool was an agent of Arizona Medical Supply, LLC, d/b/a Western Medical, and directed its fraudulent practices.

79. Had CMS known these prescriptions were procured through prohibited unsolicited

U.S. ex rel. Bearden v. Arizona Medical Supply et. al
SEALED First Amended False Claims Act Complaint

Page 18 of 23

calls, it would not have paid or reimbursed the claims. Thus, by virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, and of the false or fraudulent records and statements made, used, and caused to be made and used by Defendants, the United States has suffered damages.

80. Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## COUNT II

### DEFENDANTS' CONSPIRACY TO SUBMIT FALSE CLAIMS FOR PROSTHETICS AND ORTHOTICS INELIGIBLE FOR THE MEDICARE BENEFIT IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(C)

81. Relator restates and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

82. As set forth above, at all times relevant to this complaint and continuing through the present day, Defendants Arizona Medical Supply, d/b/a Western Medical, and Privacy Maxx conspired, upon information and belief, to commit violations of the False Claims Act, 31 U.S.C. § 3729(a)(1).

83. Defendants Arizona Medical Supply and Privacy Maxx, upon information and belief, together retained a call center in the Philippines with the purpose of telemarketing to Medicare beneficiaries in the United States and to induce them to order Medicare-covered prosthetics and orthotics through Arizona Medical Supply, d/b/a Western Medical.

84. By virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, and of the false or fraudulent records and statements made, used, and caused to be

made and used by Defendants, the United States has suffered damages

## COUNT III

### DEFENDANTS' FALSE CLAIMS FOR PAIN AND SCAR CREAMS INELIGIBLE FOR THE MEDICARE BENEFIT IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)

85. Relator restates and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

86. Since November 2013 and continuing through the present day, Arizona Medical Supply, LLC, d/b/a Senior First Medical, knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for pain and scar creams that were obtained as a result of and derived from prohibited unsolicited telephone calls, and were therefore explicitly excluded from payment.

87. Had CMS known these prescriptions were procured through prohibited unsolicited calls, it would not have paid or reimbursed the claims. Thus, by virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, and of the false or fraudulent records and statements made, used, and caused to be made and used by Defendants, the United States has suffered damages.

88. Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

U.S. ex rel. Bearden v. Arizona Medical Supply et. al
SEALED First Amended False Claims Act Complaint

Page 20 of 23

## COUNT IV

### DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS BASED ON THE PAYMENT OF KICKBACKS, 31 U.S.C. § 3729(a)(1)

89. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

90. Arizona Medical Supply's routine waiver of Medicare copayments violates the Anti-Kickback Statute and caused false claims to be submitted to the federal government. Since the Anti-Kickback Statue is a critical provision of Medicare, compliance with it is material to the government's treatment of claims for reimbursement.

91. Had the United States known that Medicare beneficiaries ordered and used Arizona Medical Supply's braces and creams because the beneficiaries had been offered kickbacks to do so, the United States would not have provided reimbursement for these items. As the United States was unaware of the illegality of the claims, and in reliance on the accuracy and legality thereof, made payment upon the false or fraudulent claims, the United States was damaged.

92. The kickbacks described herein are strictly illegal and have had the direct and indirect effect of greatly increasing the amount of Arizona Medical Supply orders by beneficiaries, and as paid for by the government under the auspices of Medicare. Furthermore, Arizona Medical Supply made representations and certifications to Medicare that they would abide by the AKS. Because Arizona Medical Supply offered illegal remuneration to Medicare beneficiaries in violation of the AKS, these representations and certifications were false.

93. Defendants' payment of  kickbacks represents the continuous inducement of federal

U.S. ex rel. Bearden v. Arizona Medical Supply et. al
SEALED First Amended False Claims Act Complaint

Page 21 of 23

payments through a pattern of fraudulent conduct and constitutes false claims within the meaning of 31 U.S.C. § 3729.

## PRAYER

Wherefore, Relator, on behalf of himself individually, and acting on behalf, and in the name, of the United States, respectfully demands and prays that judgment be entered against the Defendants, jointly and severally, as follows:

a.   With respect to each Count under the False Claims Act, as amended, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are permitted or required by law;

b.   That the Relator be awarded the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d);

c.   That the Relator be awarded all costs and expenses of this action, including attorney fees, expenses, and costs as permitted by 31 U.S.C. § 3730(d);

d.   That the United States and Relator receive all such other relief as may be just and proper.

U.S. ex rel. Bearden v. Arizona Medical Supply et. al
SEALED First Amended False Claims Act Complaint

Page 22 of 23

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, hereby demands a jury trial on all claims alleged herein.

Dated April 08th, 2014.                    Respectfully submitted,

By: _____

**WATERS & KRAUS, LLP**
Charles S. Siegel (admitted *pro hac vice*)
Loren Jacobson (admitted *pro hac vice*)
Caitlyn Silhan (admitted *pro hac vice*)
3219 McKinney Ave.
Dallas, Texas 75204
Tel. 214-357-6244

**RAY QUINNEY & NEBEKER PC**
Brett L. Tolman
Eric Benson
36 South State St.
Suite 1400
Salt Lake City, Utah 84111
Tel. 801-532-1500

***ATTORNEYS FOR RELATOR***